[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action concerns injuries sustained by the plaintiff as a result of a fall at a supermarket operated by the defendant on April 15, 1989. There is no question but that the premises were under the control of the defendant and that the public was invited CT Page 8775 to enter and make food purchases.
Significant rain, had fallen during the day, and when the plaintiff entered the store at about 3:00 p. m. puddles of water had accumulated throughout the parking lot. The plaintiff was wearing rubber soled shoes. He entered the store through a vestibule which had a mat on the floor. He then turned left and after four or five steps he slipped on a wet spot, fell to the floor and impacted his left shoulder.
There is no question but that where he fell the floor was wet although the extent of the water accumulation is in dispute. There were no signs to warn of a wet surface and no mats such as were in the vestibule. A store employee with a mop was about twenty five feet from the place of the fall.
An expected result of wetness on a tile floor is that the floor would become slippery. The continuous rain with pedestrian traffic coming into the store was sufficient to put the defendant on notice that water would be tracked in and deposited on the floor. The presence of a store employee with a mop in the immediate vicinity of the fall demonstrates actual knowledge of the problem. The wetness was visible and if the plaintiff had looked down rather than ahead to where he was going he would have seen it.
The plaintiff experienced pain in the left shoulder immediately after the fall. A passerby helped him up, and after a brief conversation with the store manager he left without making any purchases, went home and went to bed. The fall was on a Saturday.
He experienced pain throughout the weekend, and on Monday went to the emergency room of St. Mary's Hospital. X-rays revealed no fracture, dislocation or joint abnormality. No limitation of movement was observed. The diagnosis was "injured shoulder" Ansaid was prescribed for relief of pain and he was advised not to work for six days.
Despite the advise he returned to work the next day in the construction industry, a job which required heavy lifting, but his employer, apparently in recognition of his excellent employment record, found light work for him that was within his capability.
He did not again seek medical assistance until June 27, better than two months after the accident. Dr. Tormo found "moderate limitations of movement about the left shoulder." He ordered x-rays which were negative. He also ordered an MRI which reported mild A-C hypertrophy and no evidence of tendinitis or rotator cuff tear. Dr. Tormo concluded that prognosis was guarded.
He did not return to Tormo until November 30, 1989, and saw him intermittently until April 5, 1990. He started physical therapy on December 1, 1989, and after 23 visits he discontinued that on April 5, 1990 because he did not experience improvement commensurate with the cost of treatment. Tormo's final diagnosis was moderate tightness about the greater tuberosity, a lack of the last 10 degrees of abduction and rotations of the shoulder, and he made an evaluation of 5% permanent, partial disability of the left CT Page 8776 shoulder.
His total expenses for the doctor, emergency room, prescriptions, the MRI, and the physical therapy were $2,804.77. The MRI alone was $800. To a lay person this might well appear to be an overreaction, but I cannot quarrel with Dr. Tormo who felt this was reasonably medically indicated and that the charge was not out of line. At the time of trial in October, 1991 he was still experiencing pain and limitation of motion in the left shoulder. He retired approximately a year ago. I do not ascribe any great significance to the various delays in seeking medical assistance. I accept his statement that he hoped the problem would abate with the passage of time and therefore took a very conservative approach. No additional medical treatment is indicated.
I find that his past economic loss, plus his past non-economic loss, plus future non-economic loss of $2,000, total $13,000. He must bear 25% of the loss by reason of his failure to observe the wet spot and take measures to avoid it thus reducing the award to $9,750.
Judgment may enter for the plaintiff in the amount of $9,750, costs to be taxed.
HEALEY STATE TRIAL REFEREE